**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JESSIE RODRIGUEZ,
*Petitioner-Appellant*,

v.

MIKE MCDONALD, Warden,
*Respondent-Appellee.*

No. 12-56594

D.C. No.
2:10-cv-08842-JAK-JPR

OPINION

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted May 9, 2017
Pasadena, California

Filed September 29, 2017

Before: Harry Pregerson and Michelle T. Friedland,
Circuit Judges, and Robert S. Lasnik,[*] District Judge.

Opinion by Judge Lasnik

---

[*] The Honorable Robert S. Lasnik, United States District Judge for
the Western District of Washington, sitting by designation.

**SUMMARY**[**]

**Habeas Corpus**

The panel reversed the district court's judgment denying Jessie Rodriguez's habeas corpus petition challenging his conviction for second-degree murder and attempted murder, and remanded, in a case in which Rodriguez, who was fourteen years old at the time detectives interviewed and arrested him, argued that his written confession was obtained in violation of *Miranda v. Arizona*.

After reviewing the record available to the state courts, including a videotape of the interview and transcript of that videotape, the panel held that the California Court of Appeal's determination that the detectives honored Rodriguez's invocation of his right to counsel was unreasonable. Having concluded that the state court's decision was based on an unreasonable determination of facts, the panel reviewed the legal issues *de novo*, and held that the government failed to meet its heavy burden of showing that Rodriguez's subsequent waiver of his right to counsel was knowing, intelligent, and voluntary. The panel held that the admission of Rodriguez's confession was not harmless, and that Rodriguez is therefore entitled to habeas relief.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Tony Faryar Farmani (argued), Farmani APLC, Rancho Santa Fe, California, for Petitioner-Appellant.

Ryan M. Smith (argued), Deputy Attorney General; Kenneth C. Byrne, Supervising Deputy Attorney General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

## OPINION

LASNIK, District Judge:

When Jessie Rodriguez was fourteen years old, a California jury found him guilty of second-degree murder and attempted murder. Because the government relied on a coerced waiver of the right to counsel to secure this conviction, we grant Mr. Rodriguez's request for relief under 28 U.S.C. § 2254.

## I. BACKGROUND

On the evening of February 23, 2005, while Manuel Penaloza and Cynthia Portillo were walking near Gabanzo Park in Los Angeles, a brown minivan slowed and approached them.[1] Mr. Penaloza saw two men in the van, the driver and a passenger. The passenger asked the couple,

---

[1] The California Court of Appeal referred to a Gabanzo Park. We are not aware of any such park in the Los Angeles area. There is, however, a Garvanza Park near where the shooting occurred.

"Where are you from?" Mr. Penaloza understood this question as a gang challenge – a demand to know what gang Mr. Penaloza was affiliated with. He truthfully replied that he was from the Drifters gang. Instantly, shots were fired from inside the van. Mr. Penaloza was wounded in the shoulder, and Ms. Portillo was shot in the head. Mr. Penaloza panicked and fled. Ms. Portillo did not survive. *People v. Rodriguez*, No. B194159, 2007 WL 4465197, at *1 (Cal. App. Dep't Super. Ct. Dec. 21, 2007). Roughly two hours later, Officer Carlos Langarica of the Los Angeles Police Department saw a brown van driving in Highland Park. By that time, he had received reports of the Gabanzo Park drive-by shooting and another such shooting that night. Because the van matched the description of the shooter's vehicle, Officer Langarica stopped the van. *Id*. at *2.

Angel Gomez was the van's driver; Richard Powell was the passenger. Two fully loaded handguns were recovered from the van, a .22 caliber revolver and a .25 caliber semi-automatic. Ammunition for those weapons was also recovered, along with an expended cartridge case and a leather glove. A live bullet was found in Mr. Powell's pocket. *Id*.

Detective Luis Rivera interviewed Mr. Gomez and Mr. Powell. Mr. Gomez and Mr. Powell implicated a person named "Husky" in the shooting. Detective Rivera determined that "Husky" was the gang moniker of Jessie Rodriguez. He obtained a photograph of Mr. Rodriguez and placed it in a six-pack photographic lineup, which he showed to the shooting victim Mr. Penaloza. Mr. Penaloza was very uncooperative. He pointed to two photographs – including Mr. Rodriguez's photograph – and said, "One of those two is the person who shot me. There. Now you know." *Id*.

Over a month later, on the morning of March 28, 2005, Detective Rivera and his partner, Detective Jose Carrillo, arrested Mr. Rodriguez at the juvenile probation camp where he was then living and brought him to the local police station for an interview. *Id*. At the time of his arrest and interview, Mr. Rodriguez was fourteen years old. He had completed ninth grade.

This interview was videotaped and transcribed. The following exchanges are excerpted from that transcript.

Before the officers delivered *Miranda* warnings to Mr. Rodriguez, they questioned him about his name, address, family, schooling, and juvenile record. They also asked whether he had any nicknames or tattoos:

| | |
|---|---|
| Officer: | And you're from Highland Park? |
| Rodriguez: | Yeah. |
| Officer: | And what do they call you? |
| Rodriguez: | Chubs. |
| Officer: | Chubs, C-H-U-B-S. Anything else? |
| Rodriguez: | No. |
| Officer: | You don't have any other lead names? That's the only lead name you have? |
| Rodriguez: | Yeah. |

Officer:        Cause I'm looking at your sheet here and it shows that you have a lot of nicknames.

Rodriguez:      [Inaudible]

Officer:        What other names do they say that they call you?

Rodriguez:      Just Chubs.

Officer:        I know, but what other names do you know that they call you?

Rodriguez:      Just that, Chubs.

Officer:        Don't they call you Husky?

Rodriguez:      No.

Officer:        That's on your rap sheet.

Rodriguez:      I know, cause that's like a long time ago [inaudible].

[....]

Officer:        Do you have any tattoos?

Rodriguez:      Yeah, on my arm.

Officer:        Let me see what you have. HIP. That's fairly new.

Officer:    Who did it?

Rodriguez:  My friend.

Officer:    Huh?

Rodriguez:  My friend.

Officer:    What's your friend's name?

Rodriguez:  Victor.

Officer:    Victor what?

Rodriguez:  Victor Rigosa or something like that.

Officer:    Victor Rigosa.

Rodriguez:  Yeah, something like that.

Officer:    Is he in HIP too?

Rodriguez:  No.

Officer:    [Inaudible] What else do you got?

Rodriguez:  That's it.

Officer:    Let me se [sic] your upper arm?  How about your other arm?  Do you have anything on your other arm?

Rodriguez:     No.

Officer:       That tattoos [sic] about what, three, four weeks old?

Rodriguez:     No.

Officer:       Yeah.

Rodriguez:     Three months ago.

Officer:       Three months ago, no, that's more than that that's –

Officer:       Let me see that again?

Rodriguez:     [Inaudible]

Officer:       [Inaudible]

Officer:       [Inaudible]

Rodriguez:     [Inaudible]

Officer:       That is not.

Officer:       They did a lousy job.  Was he high?  Was he drunk or what? How long till they finish it.

Rodriguez:     It is finished.

Officer:       That's finished?

Rodriguez:     Yeah.

Officer:        [Inaudible]

Rodriguez:      [Inaudible]

Officer:        Don't tell me you paid for that man?

Rodriguez:      No.

Officer:        Man, that tattoo couldn't be no more than a month.

Officer:        That's his first tattoo.

Rodriguez:      You don't believe me?

Officer:        You got it.  I've seen – I've seen a lot of tattoos over the years.

Rodriguez:      [Inaudible] I got it in early December somewhere like that.

After briefly asking Mr. Rodriguez whether he ever wore a mustache or a goatee, the officers delivered *Miranda* warnings as follows:

Officer:        Jessie, we want to talk to you but because you belong to the camp okay, [there are] certain procedures that the camp and the juvenile courts feels that we must do.  Now, because we want to talk to you about

certain incidents, I have to advise you [of] your rights. You've heard these before, right? Okay.

Rodriguez:     Uh-huh.

Officer:     Okay. You know what, I have to read them to you anyway regardless of whether you know them or not. You have the right to remain silent, do you understand?

Rodriguez:     Yes.

Officer:     Anything you say can be used against you in a court, do you understand?

Rodriguez:     Yes.

Officer:     You have the right of the presence of an attorney before and during any questioning, do you understand?

Rodriguez:     Yes.

Officer:     If you cannot afford an attorney one will be appointed for you free of charge before any questioning, if you want, do you understand?

Rodriguez:        Yes.

Officer:          Okay.

The officers then questioned Mr. Rodriguez about his involvement in the drive-by shooting. The officers repeatedly suggested that Mr. Rodriguez had been riding in the van with Angel Gomez, and that Mr. Gomez had pressured him to shoot Mr. Penaloza to prove his loyalty to the Highland Park gang. Mr. Rodriguez repeatedly denied being in the van during the shooting. In response, the officers repeatedly accused Mr. Rodriguez of lying and told him that others had already implicated him in the shooting. They showed Mr. Rodriguez pictures of Angel Gomez and Richard Powell, and told him that they knew the two men went by "Vamps" and "Away," respectively. They told Mr. Rodriguez that Mr. Penaloza had claimed that he saw both "Away" and Mr. Rodriguez at the scene of the crime, and that "Away" had already told the officers what happened.

Eventually, Mr. Rodriguez asked for an attorney:

Rodriguez:        Can I speak to an attorney?

Officer:          Whatever you want.

Rodriguez:        Can I speak to an attorney?

Officer:          You tell me what you want.

Rodriguez:        That is what I want.

Officer:          That's fine bro we stop because we can't talk to you anymore, okay, so.

Officer:        You're going to be charged with murder today.

Rodriguez:      Why?

Officer:        Why?

Officer:        We already told you why, man, we've already told you why. Remember when we came in we told you we were investigating. This is what's been said about you. We asked you to tell us the truth; you were going to tell us what happened? That's what we meant tell us what's – tell us what's going on, so we can put – so we can put your story on paper. That is the reason we're asking you this. If you want to talk to an attorney you can talk to an attorney. To us we're just doing our job.

Officer:        If you don't want to talk to us just tell us you don't want to talk to us if you don't, that's it.

Officer:        Yeah. I mean, you know, it's nothing personal here, bro, we're just doing our job, man, that's all, okay. Like I said, you tell me now that's exactly

what I'm gone put on paper that's exactly what I can do for you, man, that's it – that's it. We can go on to other cases and other things. We'll just see you in court. I just want you to remember that I tried to give you the opportunity. I tried to give you the opportunity to straighten things out.

Officer: Do you know Easy from Highland Park? You don't know him?

Rodriguez: No.

Officer: You don't know him? This one here? [Shows Mr. Rodriguez a photograph] You don't know him?

Rodriguez: No.

Officer: The girl that died, that's his girlfriend.

Officer: [Inaudible]

Officer: Yeah, I guess we can. I got to take him downtown and process him.

Rodriguez:      You're not going to charge me?

Officer:        You['re] going to East Lake.

Rodriguez:      What am I going to East Lake for?

Officer:        Cause they're going to charge you with murder.

Officer:        When you get charged with a crime, they take you to East Lake it's up to East Lake to send you [back up] here, man, okay. Like I said, I ain't got nothing personal here my bro, you know [Inaudible].

Officer:        [Inaudible] take him down and fingerprint him and all that.

Rodriguez:      Can I get my [inaudible] the one I was wearing [inaudible].

Officer:        We're going to keep it. We're going to keep those.

Officer:        You'll get them back later.

Rodriguez:      All right.

Officer:        You want some water?

Rodriguez:    Yeah.

The recording concludes at that point.

The California Court of Appeal summarized the rest of the proceedings as follows:

> [Mr. Rodriguez] was transported to the central station for fingerprinting and photographing.  He was then returned to the local station, while the detectives completed their reports.  After doing so, they took [Mr. Rodriguez] to a juvenile facility.
>
> Shortly after their arrival, while in the intake area of the juvenile facility, [Mr. Rodriguez] asked Detective Rivera, "what's going to happen?"  The detective replied that the case was going to be presented to the prosecutor's office.  [Mr. Rodriguez] then requested the detective's business card, explaining that he might want "to talk" to the detective.  In response, Detective Rivera explained that because [Mr. Rodriguez] had invoked his right to counsel, the detective could not speak to him until [Mr. Rodriguez] had spoken to an attorney, unless [Mr. Rodriguez] "changed his mind" about exercising his right to counsel.  [Mr. Rodriguez] replied that he wanted to talk to the detective.  Detective Rivera requested an interview room and a tape recorder, but no such device was available.  Once inside the interview room, [Mr. Rodriguez] narrated what happened during the shooting incident.  At the

detective's request, [Mr. Rodriguez] wrote his own statement, which was admitted in evidence.

2007 WL 4465197, at *2–3.    In that statement, Mr. Rodriguez confessed to shooting Mr. Penaloza at the urging of Mr. Gomez.

In January 2006, on the government's motion, the Juvenile Division of the Los Angeles County Superior Court held a fitness hearing to determine whether Mr. Rodriguez was "a fit or proper subject to be dealt with under juvenile court law" or whether he should be tried as an adult.  At that hearing, the court reviewed a May 2005 report from a psychologist who had interviewed Mr. Rodriguez and concluded that he had "border-line intelligence functioning," which rendered him particularly "susceptible to the influence of others."   The psychologist reported that Mr. Rodriguez had an I.Q. of seventy-seven, meaning that he was "quite limited intellectually," and that he tested at a fourth- or fifth-grade academic level though he had completed ninth grade.  The report predicted that this intellectual limitation "will prevent him from making good decisions as he is likely to be more concrete than abstract in his problem solving capacity."

The report further noted that Mr. Rodriguez exhibited "symptoms related to [Attention Deficit Hyperactivity Disorder]" and that he had been "placed on medication . . . to help him concentrate" while residing at the juvenile camp. According to the report, "[t]he literature shows that individuals who suffer from the disorder tend to not do well with respect to making good decisions."  At the end of the hearing, the court concluded that Mr. Rodriguez was not fit

for adjudication in juvenile court and referred the matter for prosecution under the general law.

In April 2006, Mr. Rodriguez was charged by information in Los Angeles County Superior Court. The information charged Mr. Rodriguez with the murder of Ms. Portillo (in violation of Cal. Penal Code § 187(a)) and with the attempted murder of Mr. Penaloza (in violation of Cal. Penal Code §§ 664/187(a)). As to both counts, the information charged Mr. Rodriguez with causing great bodily injury or death by intentionally discharging a firearm (under Cal. Penal Code § 12022.53(d)), and with acting for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote criminal conduct by gang members (under Cal. Penal Code § 186.22(b)(1)(C)).

Mr. Rodriguez's jury trial took place in early September 2006. On September 7, 2006, the court held a hearing on Mr. Rodriguez's motion to suppress his confession on the grounds that it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and the due process clause. The transcript of the videotaped police interview was admitted into evidence. Both parties agreed that Mr. Rodriguez had invoked his right to counsel by asking twice, "Can I speak to an attorney?"

The parties' accounts of what followed, however, differed. Detective Rivera testified that he and Detective Carrillo had ceased their interrogation once Mr. Rodriguez invoked his right to counsel, and that Mr. Rodriguez had initiated the second interview by asking for a business card at the juvenile detention center. Mr. Rodriguez testified that the detectives had continued to discuss the case with him after he requested a lawyer; that they pressured him to give a statement by promising to keep his case in juvenile court if

he cooperated; that Detective Rivera handed him the business card and invited him to talk; and that the detectives told him what to say in his eventual written confession.

From the bench, the court denied Mr. Rodriguez's motion to suppress:

> I am going to deny the motion. . . . The defendant did invoke his right to an attorney and the detectives honored that. I agree with the prosecution. This is a credibility situation that is presented to the court. Who do I believe?

> Well, do I believe the detective or do I believe Mr. Rodriguez on some of these critical points? And frankly, I found Mr. Rodriguez to be less than credible on many things, including how he came to make certain statements in the written document that has been marked as People's 1. And the fact that he made statements that are difficult for the court to accept regarding what was said in that document I think colors all of his testimony.

> I found the detective's testimony to be believable. It would have been better had there been a tape recording of the reinitiation of the interrogation. But the case law is settled that statements volunteered not in response to an interrogation are admissible against the defendant even after the initial assertion of the right to remain silent. I think that's what we have here.

And, frankly, I think the evidence is very persuasive that the defendant initiated the discussion of the case after invoking his rights at the Eastlake facility. And proceeded then to sit down and write out what is – I agree with you, [defense counsel] – this is a confession. And I do not find credibility to the statement that the detectives told him to write certain portions of this.

It's just not very believable in the way the evidence was presented by the defendant today. And particularly since there are some statements in here about how he shot at the direction of others and the other things that are here, that Angel told me shoot him, shoot him, certainly rings true based on what little the court knows about the case.

In any event, I feel that the evidence is more than persuasive that the defendant's constitutional rights were not violated. And the statement will be admitted.

At trial, the government played the videotape of the detectives' first interview with Mr. Rodriguez, including the portions preceding the *Miranda* warnings, and gave the jury a partially redacted transcript of the video to aid their understanding. In opening and closing, the government relied both on Mr. Rodriguez's videotaped interview and on Mr. Rodriguez's written statement as evidence of his guilt. The government emphasized Mr. Rodriguez's tattoo and argued that he had received it in late February 2005 – just as the detectives had suggested during the interview – as a badge after proving his loyalty to the gang by shooting Mr.

Penaloza and Ms. Portillo. The government presented no physical evidence linking Mr. Rodriguez to the shooting.

On September 13, 2006, during their deliberations, the jury sent out the following note:

> "Imaginary doubt" is not reasonable doubt, as per the instructions. A concern has been raised over the credibility of the confession and whether the defendant may have felt pressured, not necessarily by the detectives, but by his situation to confess to a crime that he did not commit. However, there has been no evidence submitted to substantiate this conjecture. Is this concern or suspicion "imaginary doubt."? If you cannot answer this question, then what is the legal definition of "imaginary doubt"?

In response to this question, the court re-read its instructions on presumption of innocence, reasonable doubt, and what constitutes evidence. The jury also asked the court about its instruction providing that the defendant may not be convicted based on his out-of-court statements alone. The court re-read that instruction and explained that "That language goes to whether or not there was a crime. That is up to the jury to decide if there was evidence in the case separate and apart from the defendant's statement that a crime, and in this case – the two charged crimes are murder and attempted murder – if a murder and attempted murder were committed."

Later that day, the jury returned its verdict, finding Mr. Rodriguez guilty of second-degree murder and attempted murder. The jury further found that, as to both offenses, Mr. Rodriguez had intentionally discharged a firearm, causing

great bodily injury or death, and had acted for the benefit of a criminal street gang.  On September 26, 2006, Mr. Rodriguez was sentenced to eighty-four years to life in prison.

Mr. Rodriguez timely appealed, arguing that his written confession had been erroneously admitted in violation of *Miranda*.  On December 21, 2007, the California Court of Appeal affirmed Mr. Rodriguez's conviction.  2007 WL 4465197, at *10.  The Supreme Court of California granted, then summarily dismissed, Mr. Rodriguez's petition for direct review.  Mr. Rodriguez unsuccessfully sought collateral relief in state court.

On November 17, 2010, Mr. Rodriguez filed a petition under 28 U.S.C. § 2254 in the U.S. District Court for the Central District of California.  On the report and recommendation of the magistrate judge, the district court denied that petition and denied a certificate of appealability.  Mr. Rodriguez timely appealed, and on September 5, 2013, this court granted a certificate of appealability as to the question whether Mr. Rodriguez's confession was obtained in violation of *Miranda* or the due process clause.

## II.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 2253.  We review *de novo* a district court's decision to deny a petition for habeas relief under 28 U.S.C. § 2254.  *Arredondo v. Ortiz*, 365 F.3d 778, 781 (9th Cir. 2004).  Because Mr. Rodriguez's petition was filed after 1996, the amendments to Section 2254 under the Antiterrorism and Effective Death Penalty Act ("AEDPA") apply.  *Id*.

Under AEDPA, this court may not grant habeas relief to a state prisoner on the basis of claims previously adjudicated on the merits in state-court proceedings unless the last reasoned decision from the state court system – here, the decision of the California Court of Appeal – either (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (quoting 28 U.S.C. § 2254(d)).

"A state court's factual findings are unreasonable if 'reasonable minds reviewing the record' could not agree with them." *Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016) (quoting *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015)). If, considering only the record before the state court, we determine that the state court's decision was based on an unreasonable determination of the facts, we next evaluate the petitioner's legal claim *de novo*, and we may consider evidence presented for the first time in federal court. *See Crittenden v. Chappell*, 804 F.3d 998, 1010–11 (9th Cir. 2015) (quoting *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014)). Still, even then, the state court's factual findings are entitled to a presumption of correctness that can be overcome only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Crittenden*, 804 F.3d at 1011.

## III.  DISCUSSION

Mr. Rodriguez argues – as he has since September 2006 – that his written confession was obtained in violation of *Miranda*. We agree. The California Court of Appeal unreasonably determined that the detectives had honored Mr. Rodriguez's invocation of his right to counsel. In turn,

the Court of Appeal erroneously concluded that Mr. Rodriguez's subsequent waiver of his right to counsel was knowing, intelligent, and voluntary. There is a presumption against waiver, and the government bears the burden of proving that a supposed waiver was valid. Because the government has not overcome that presumption, and because we cannot conclude that the admission of Mr. Rodriguez's confession was harmless, Mr. Rodriguez is entitled to habeas relief.

## A. Unreasonable Determination of the Facts

On habeas review, the state court's factual findings are entitled to a presumption of correctness, and may not be overturned unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); *Doody v. Ryan*, 649 F.3d 986, 1002 (9th Cir. 2011) (en banc). Moreover, we cannot find that the state court made an *unreasonable* determination of the facts unless we are "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record" before the state court. *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

Mr. Rodriguez argues that the state courts erroneously credited Detective Rivera's account of Mr. Rodriguez's detention and interrogations over Mr. Rodriguez's, and attaches to his federal habeas petition a declaration summarizing his version of events in more detail. Because this court's review of the state court's factual determinations under Section 2254(d)(2) is limited to the evidence presented in the state court proceeding, Mr. Rodriguez has not shown by clear and convincing evidence that the state courts' credibility determinations were unreasonable. Accordingly, this court is bound for the most part by the factual findings

of the California Court of Appeal and the Los Angeles County Superior Court, as those findings are based on those credibility determinations and in turn on Detective Rivera's account of the events in question.

The court may make an exception, however, for the portion of the detention memorialized by the videotape and transcript. *See Doody*, 649 F.3d at 1009 ("The audiotapes of Doody's interrogation are dispositive in this case, as we are not consigned to an evaluation of a cold record, or limited to reliance on the detectives' testimony."); *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005) ("[B]ecause we have a videotape of the challenged interrogation, there is no mystery about any communications that related to *Miranda*'s requirements."). That videotape and transcript rebut by clear and convincing evidence the state courts' factual determination that the detectives honored Mr. Rodriguez's invocation of his right to counsel – a factual determination that, on the record before the state trial court, was unreasonable.

In this case, it is undisputed that Mr. Rodriguez invoked his right to counsel. Instead of immediately ceasing their interrogation, however, the detectives told Mr. Rodriguez that he was "going to be charged with murder today," and to "remember that [they] tried to give [Mr. Rodriguez] the opportunity . . . to straighten things out." One of the detectives then explicitly asked Mr. Rodriguez about the case:

> Officer:     Do you know Easy from Highland Park? You don't know him?
>
> Rodriguez:   No.

Officer:        You don't know him?  This
                one here?  You don't know
                him?

Rodriguez:      No.

Officer:        The girl that died, that's his
                girlfriend.

This "express questioning" was clearly custodial interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300–02 (1980) (defining interrogation as either "express questioning" or "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response"); *id.* at 302 n.8 ("Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect."). The detectives did not honor Mr. Rodriguez's invocation of his right to counsel.

The state trial court, however, simply characterized this exchange as:  "The defendant did invoke his right to an attorney and the detectives honored that."  Effectively, the trial court appeared to credit Detective Rivera's suppression hearing testimony that he "cease[d the] interrogation" after Mr. Rodriguez invoked, over Mr. Rodriguez's testimony that the detectives "continue[d] to talk to [him]," without regard to the transcript of the interview, which was in evidence during the suppression hearing.  On direct appeal, rather than reversing this finding as unsupported by the evidence, the California Court of Appeal "defer[red] to [the trial court's] findings that the detectives ceased questioning

upon defendant's invocation in the first interview" and concluded that the detectives "honored defendant's invocation" and "stopped the interview."

The videotape and transcript of Mr. Rodriguez's interview constitute clear and convincing evidence sufficient to rebut the state courts' factual finding that the detectives honored Mr. Rodriguez's invocation of his right to counsel by immediately ceasing their interrogation. *See* 28 U.S.C. § 2254(e)(1). After reviewing the record available to the state courts, including the videotape of the interrogation and the transcript of that videotape, no appellate panel could reasonably conclude otherwise. *See Taylor*, 366 F.3d at 1000. Accordingly, 28 U.S.C. § 2254(d)(2)'s bar is overcome.

## B. *De Novo* Review of Mr. Rodriguez's *Miranda* Claim

Once we have concluded that the state court's decision was based on an unreasonable determination of facts under 28 U.S.C. § 2254(d)(2), we review the legal issues *de novo*. *See Hurles*, 752 F.3d at 778. Doing so, we conclude that Mr. Rodriguez did not validly waive his previously invoked right to counsel.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires that an accused be informed of his right to have counsel present during custodial interrogation. *Id.* at 471. If the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. *Id.* at 474. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-

incrimination and his right to retained or appointed counsel."
*Id*. at 475.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the
Supreme Court further specified that once an accused has
invoked his right to counsel, he may not be subject to further
interrogation until counsel has been made available to him –
"unless the accused himself initiates further communication,
exchanges, or conversations with the police." *Id*. at 484–85.
This rule is "designed to prevent police from badgering a
defendant into waiving his previously asserted *Miranda*
rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

*Edwards* also established that "when an accused has
invoked his right to have counsel present during custodial
interrogation, a valid waiver of that right cannot be
established by showing only that he responded to further
police-initiated custodial interrogation even if he has been
advised of his rights." 451 U.S. at 484. That is, a finding
that a post-invocation admission is *voluntary* is not sufficient
to demonstrate waiver. *Id*. at 483–84. Rather, for an
uncounseled post-invocation statement to be admissible, the
court must also find that the suspect first waived his right to
counsel knowingly, intelligently, and voluntarily. *Id*. at
482–84. "A valid waiver of counsel rights should not be
inferred from the mere response by the accused to overt or
more subtle forms of interrogation or other efforts to elicit
incriminating information." *Id*. at 484 n.8.

In *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), the
Supreme Court reiterated this latter *Edwards* rule: "even if
a [post-invocation] conversation . . . is initiated by the
accused, where reinterrogation follows, the burden remains
upon the prosecution to show that subsequent events
indicated a waiver of the Fifth Amendment right to have
counsel present during the interrogation." *Id*. at 1044

(Rehnquist, J., plurality opinion).  A plurality of the Supreme Court criticized the Oregon Court of Appeals for erroneously "thinking that an 'initiation' of a conversation or discussion by an accused not only satisfied the *Edwards* rule, but *ex proprio vigore* sufficed to show a waiver of the previously asserted right to counsel.  The inquiries are separate, and clarity of application is not gained by melding them together." *Id.* at 1045 (Rehnquist, J., plurality opinion); *see also id.* at 1048–49 (Powell, J., concurring) (recognizing that eight justices agree that *Edwards* requires separate consideration of (1) initiation, and (2) knowing, intelligent, and voluntary waiver); *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam) (recognizing two-step analysis of initiation and waiver).

Finally, in *Arizona v. Roberson*, 486 U.S. 675 (1988), the Supreme Court cited *Edwards* for the proposition that "if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is *presumed* that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' [of custodial interrogation] and not the purely voluntary choice of the suspect." *Id*. at 681 (emphasis added).

Waiver of the right to counsel must be done knowingly, intelligently, and voluntarily.  *Miranda*, 384 U.S. at 475. That is, it must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The validity of a waiver depends in each case "upon the particular facts and circumstances surrounding [the] case,

including the background, experience, and conduct of the accused." *Edwards*, 451 U.S. at 482 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Where the suspect is a minor, the analysis necessarily considers his "age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). There is a presumption against waiver, and the government bears the heavy burden of showing that a waiver was valid. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *see also Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (clarifying "that this 'heavy burden' is . . . the burden to establish waiver by a preponderance of the evidence" (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

The government failed to meet that burden in its prosecution of Mr. Rodriguez. The voluntariness of a suspect's waiver – like the voluntariness of a subsequent confession – is assessed by examining both the police methods used to produce the waiver and the individual characteristics of the suspect to determine whether the suspect's will was overborne. *See Collazo v. Estelle*, 940 F.2d 411, 415–16 (9th Cir. 1991) (en banc); *see also Connelly*, 479 U.S. at 520–21 ("[M]ental condition is surely relevant to an individual's susceptibility to police coercion"). We address Mr. Rodriguez's individual characteristics first.

In the context of the requisite waiver analysis, Mr. Rodriguez's youth is impossible to ignore. Mr. Rodriguez was fourteen years old at the time of his arrest and interview. As the Supreme Court has repeatedly recognized, youth are particularly susceptible to pressure from police. *See, e.g.*,

*J.D.B. v. North Carolina*, 564 U.S. 261, 272–73 (2011) ("[A] reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go"); *Gallegos v. Colorado*, 370 U.S. 49, 52–54 (1962) (stating that a juvenile "cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions" for purposes of determining whether a confession was obtained in violation of due process); *Haley v. Ohio*, 332 U.S. 596, 599–600 (1948) (plurality opinion) ("What transpired would make us pause for careful inquiry if a mature man were involved[, a]nd when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used").

In *Haley*, for example, the Supreme Court emphasized that the voluntariness of a fifteen-year-old boy's waiver and confession "cannot be judged by the more exacting standards of maturity.  That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens."  332 U.S. at 599.  And in *Gallegos v. Colorado*, 370 U.S. 49 (1962), the Court recognized that "a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. . . . He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions." *Id*. at 54.  These cases instruct that the voluntariness of a child's confession or waiver cannot be properly assessed without attention to his age. *Cf. J.D.B.*, 564 U.S. at 265 (holding that "a child's age properly informs the *Miranda* custody analysis").  In this case, Mr. Rodriguez's youth rendered him unusually vulnerable to police coercion.

At the time of his interrogation, Mr. Rodriguez was not only young; he also had Attention Deficit Hyperactivity Disorder and a "borderline" I.Q. of seventy-seven. An I.Q. "between 70 and 75 or lower . . . is typically considered the cutoff I.Q. score for the intellectual function prong of the mental retardation definition." *Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002) (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000)). Like youth,"mental condition is surely relevant to an individual's susceptibility to police coercion." *Connelly*, 479 U.S. at 165; *see also United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998) ("[a] defendant's mental capacity directly bears upon the question whether he understood the meaning of his *Miranda* rights and the significance of waiving his constitutional rights" (first citing *Derrick v. Peterson*, 924 F.2d 813, 817–24 (9th Cir. 1990), *overruled on other grounds by United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014) (en banc); then citing *United States v. Glover*, 596 F.2d 857, 865 (9th Cir. 1979)); *cf. Preston*, 751 F.3d at 1022 ("It simply 'takes less' in terms of sophisticated police interrogation techniques 'to interfere with the deliberative processes of one whose capacity for rational choice is limited than it takes to affect the deliberative processes of one whose capacity is not so limited'" (quoting *Smith v. Duckworth*, 910 F.2d 1492, 1497 (7th Cir. 1990)). Accordingly, Mr. Rodriguez's age and intellectual limitations made him susceptible to suggestion and coercion.[2]

---

[2] This case is unlike *United States v. Bernard S.*, 795 F.2d 749 (9th Cir. 1986), where we affirmed the validity of a seventeen-year-old suspect's waiver. In *Bernard S.*, the suspect was accompanied by his mother during the interrogation, but Mr. Rodriguez faced two experienced officers alone. He did not sign a waiver of his rights. And

Turning to the other prong of the voluntariness inquiry, the tactics employed by police in this case further support the conclusion that Mr. Rodriguez's confession was not voluntary.  The officers suggested to Mr. Rodriguez that cooperation would result in leniency:  they told him they would take "what you tell us" to the district attorney "and say, hey man, you know what, this guy – we think – he's – you know, he's 14 maybe there was a little bit of influence from the other guys the older guys, you know, he still – we can still save him he's not an entirely bad dude."  Even more explicitly, they suggested that cooperating was the only way to "save [his] life":  "I mean, that's it what's done is done, but this is like the rest of your life now, this is the difference, you['re] only 14, man.  It's not like you['re] 18, 19 and you know, you're 14 years old, man, *you can still save your life. You still have a lifetime*."  Further:  "You got a chance to set things right, take responsibility for what you did, and then whatever happens happens but be assured that what we would like to do is talk to the district attorney tell him that you were cooperative and being truthful and [accept] the responsibility."

After Mr. Rodriguez asked for a lawyer, the officers continued to pressure him.  Though Mr. Rodriguez had repeatedly denied participating in the shooting, the officers told him he would be charged with murder later that day, increasing the urgency of cooperation.  An officer reminded Mr. Rodriguez that they had "tried to give [him] the opportunity to straighten things out," recalling the officers' earlier promises of leniency.

---

at fourteen years old, with A.D.H.D. and a "borderline" I.Q., he was more likely to be susceptible to coercive influence than the  seventeen-year-old suspect in *Bernard S*.  *See* 795 F.2d at 752–53.

This is precisely the type of threat that we have held makes a subsequent reinitiation of interrogation involuntary. In *Collazo v. Estelle*, 940 F.2d 411, 413–14 (9th Cir. 1990) (en banc), the defendant initially refused to waive his *Miranda* rights and instead asked to speak with a lawyer. He did not initiate further discussion or otherwise change his mind until the police responded that "it 'might be worse' for him if he talked to an attorney, and that it was in his interest to talk to them without one." *Id.* at 413. He then confessed to the crime for which he had been charged. *Id.* at 414. We held that this tactic was coercive, reasoning that the officer's "words were calculated to pressure Collazo into changing his mind." *Id.* at 416; *see also id.* at 419 ("overreaching behavior violated not only Miranda, but also the general Constitutional prohibition against coercive interrogation practices likely to result in involuntary responses").

Similarly here, by suggesting to Mr. Rodriguez that he would be imminently charged with murder but that cooperation would result in more lenient treatment from the court, the probation office, and from the police themselves, the officers "effectively told [Mr. Rodriguez] he would be penalized if he exercised rights guaranteed to him under the Constitution of the United States." *Id*. at 417.[3]

---

[3] Although it is generally not unconstitutional for officers to lie as an interrogation technique, we note that Detectives Rivera and Carrillo employed sophisticated interrogation techniques that likely helped overcome Mr. Rodriguez's will. Before Mr. Rodriguez's invocation of his right to counsel, the officers repeatedly told Mr. Rodriguez that they had already talked to the other men involved and that those men had told them the whole story. The officers then proceeded to feed Mr. Rodriguez details about the shooting. They framed their questions to present Mr. Rodriguez with a choice between two alternative factual narratives. Either Mr. Rodriguez was a "bad dude" who killed in cold blood, or he

Because this pressure followed Mr. Rodriguez's invocation of his right to counsel, it constituted "badgering" in direct violation of *Miranda* and *Edwards*. *See Miranda*, 384 U.S. at 474; *Edwards*, 451 U.S. at 484–85; *Harvey*, 494 U.S. at 350; *Bradshaw*, 462 U.S. at 1044. "At a point where the law required [the officer] to back off, he did not 'scrupulously honor' [Mr. Rodriguez's] right to cut off questioning; he stepped on it." *Collazo*, 940 F.2d at 417. Particularly in light of Mr. Rodriguez's special vulnerabilities to coercion, *see Preston*, 751 F.3d at 1020, we hold that these coercive police tactics overbore Mr. Rodriguez's will, and that his waiver of his previously invoked right to counsel was not voluntary.

Neither are we convinced that Mr. Rodriguez fully grasped the meaning of his *Miranda* rights by the time he purported to waive them post-invocation. While Mr. Rodriguez's request for counsel demonstrates that he

---

was a young, scared kid who shot Mr. Penaloza and Ms. Portillo under pressure from older gang members.

When Mr. Rodriguez answered in a way that conflicted with the officers' narrative, they accused Mr. Rodriguez of lying and told him that "nobody likes a liar, man, the judges [don't] like liars, the probation department doesn't like liars, police don't like the liars." When Mr. Rodriguez changed his story to fit the officers' narrative, by contrast, they praised him. Pressuring a suspect "to change answers inconsistent with guilt and adopt answers evidencing guilt instead" is a police tactic particularly likely to cause an intellectually disabled suspect to "shift" his answers "to conform to the perceived desires of the interrogator." *See Miranda*, 384 U.S. at 448 ("[C]oercion can be mental as well as physical"); *cf. Preston*, 751 F.3d at 1024 (quoting Stanley L. Brodsky & Allyson D. Bennett, *Psychological Assessments of Confessions and Suggestibility in Mentally Retarded Suspects*, 33 J. PSYCHIATRY & L. 359, 363 (2005)).

understood the content and importance of his *Miranda* rights, *see Juan H.*, 408 F.3d at 1272, the officers' subsequent failure to honor that invocation effectively amended the content of the *Miranda* warnings they had previously delivered.  Though Mr. Rodriguez was told that he had the right to "the presence of an attorney before and during any questioning," when Mr. Rodriguez asked for an attorney to assist him, no attorney was contacted.  Instead, the officers immediately continued to question Mr. Rodriguez, directly contradicting the earlier warning that Mr. Rodriguez had the right to an attorney during questioning, if he wanted one.  The officers told Mr. Rodriguez that he was going to be taken to Eastlake and charged with murder that very day.  Over the next several hours, as Mr. Rodriguez remained in police custody, no attorney was ever even contacted, let alone provided to Mr. Rodriguez.[4]

Finally, as the officers were booking Mr. Rodriguez into a juvenile detention facility – having impressed upon him that he would imminently be charged with murder – Mr. Rodriguez asked Detective Rivera what was going to happen next.  Though Detective Rivera explained that he could not speak to him until Mr. Rodriguez had spoken to an attorney, anyone in Mr. Rodriguez's shoes would have understood that no attorney would arrive before he was charged with

---

[4] Mr. Rodriguez continues to argue that he did not re-initiate conversation with the officers – that, rather, the officers continued to badger him during the car ride to Eastlake.  But absent additional corroborating evidence beyond Mr. Rodriguez's declaration and suppression hearing testimony, we cannot say that Mr. Rodriguez's evidence on this point provides the necessary clear and convincing evidence to rebut the state court's factual finding that the officers did not continue to interrogate Mr. Rodriguez on the way to Eastlake. *See* 28 U.S.C. § 2254(e)(1).

murder.    Given what the officers had told him, Mr.
Rodriguez also would have believed that speaking to
Detective Rivera without counsel was his last, best chance
to help himself.  Thus, when Detective Rivera told him that
he could "chang[e] his mind" about exercising his right to
counsel, Mr. Rodriguez's subsequent waiver was not "made
with a full awareness of both the nature of the right being
abandoned and the consequences of the decision to abandon
it." *Moran*, 475 U.S. at 421.

The danger that a suspect could be pressured to rescind
an earlier invocation of the right to counsel is exactly the
constitutional hazard that *Edwards* aimed to prevent.
*Edwards* is a "bright-line rule," expressing the "'relatively
rigid requirement that interrogation must cease'" through
"clear and unequivocal" guidelines to law enforcement.
*Roberson*, 486 U.S. at 681–82 (quoting *Fare*, 442 U.S. at
718.    Under *Edwards*, police must give even greater
deference to an invocation of the right to counsel than to a
decision to remain silent, which itself must be "scrupulously
honored":  a suspect's request for counsel, unlike a decision
to end questioning, raises the presumption that the suspect
"is unable to proceed without a lawyer's advice." *Roberson*,
486 U.S. at 683 (citing *Michigan v. Mosley*, 423 U.S. 96, 110
n.2 (1975) (White, J., concurring)).  When officers fail to
"scrupulously honor" a suspect's invocation of the right to
counsel, the suspect's subsequent waiver of that right – and
any confession that follows – is presumptively invalid.
*Roberson*, 486 U.S. at 681; *see also Miranda*, 384 U.S. at
476.   Mr. Rodriguez's waiver and confession present the
case in point.**[5]**

---

**[5]** The state trial court in this case did not even ask whether Mr.
Rodriguez's post-invocation waiver was knowing, intelligent, and

## C. Prejudice

Harmless error review applies to the introduction of Mr. Rodriguez's illegally obtained confession. *Sessoms v. Grounds*, 776 F.3d 615, 629 (9th Cir. 2015) (en banc) (citing *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991)). Reversal on collateral review is appropriate only if this court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2197–98 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

In this case, where there was no physical evidence linking Mr. Rodriguez to the crime, where the government highlighted Mr. Rodriguez's confession in both opening and closing argument, and where the jury sent out a note specifically expressing doubt about the validity of the confession, we are gravely concerned that admission of that confession did substantially and injuriously influence the jury. *See Taylor*, 366 F.3d at 1017 ("Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." (quoting *Fulminante*, 499 U.S. at 296)).

In particular, we note the government's reliance in closing argument on a theory first suggested by Detectives Rivera and Carrillo during their interview with Mr. Rodriguez: the theory that Mr. Rodriguez had received his

---

voluntary. Just as in *Edwards* itself, the state court did not "undert[ake] to focus on whether [Mr. Rodriguez] understood his right to counsel and intelligently and knowingly relinquished it." 451 U.S. at 484. Thus, as in *Edwards*, "[i]t is . . . apparent that the decision below misunderstood the requirement for finding a valid waiver of the right to counsel, once invoked." *Id*.

tattoo no more than one month prior – that is, immediately after the shooting – as confirmation that he had proven himself loyal to the gang. The portion of the videotaped interview where the detectives questioned Mr. Rodriguez about the age of his tattoo was played for the jury, even though this questioning preceded the *Miranda* warnings. Paired with this evidence, admission of Mr. Rodriguez's coerced confession, in which he admitted to shooting Mr. Penaloza because he was a member of the Drifters, likely had a substantial and injurious influence on the jury's evaluation whether Mr. Rodriguez had acted for the benefit of a "criminal street gang." Proof of this allegation resulted in a mandatory additional term of ten years, to be served consecutively. *See* Cal. Penal Code § 186.22(b)(1)(C). Altogether, admission of his confession cost Mr. Rodriguez eighty-four years in prison: the very "lifetime" that, in exchange for Mr. Rodriguez's cooperation, the detectives had offered to save.

## IV. CONCLUSION

It is clear that, in this case, a boy who invoked his constitutional right to the assistance of counsel was denied this assistance, and then was badgered into confessing murder. Accordingly, we **REVERSE** and **REMAND**. Unless the State of California elects to retry Mr. Rodriguez within a reasonable time, the district court shall grant Mr. Rodriguez's habeas petition under 28 U.S.C. § 2254.